Good afternoon, your honors. I'm Emily Eisner, counsel for appellant John Herman with co-counsel Frank Medea at counsel table. May it please the court. The first set of errors in this case are the photographs and the testimony asserting that the complainant was made to reenact the alleged crimes out of court, which denied our client a fair trial. Whose idea was that? It's reenactment. Because the whole thing is inadmissible, it should never have been admitted in evidence. Detective Bell testified that it was the civil attorneys that had come to the police investigation, which is rather unorthodox, to say the least, and that they wanted to go back and visit the scene. Now that you mention the civil attorney who was there, how about the medical student or something like that? What did we have? Everybody in the neighborhood? Yeah. It's very strange. They were all there on cue with all their ducks in a row. It was a very strange kind of investigation. And the detectives bent over backwards to accommodate them, which, fine, maybe, but it's not admissible in evidence. It has no purpose and it violates – What was the relevance of that testimony to counsel? Pardon me? What was the relevance of that testimony to counsel? There is no relevance. It violates two rules of evidence. The first one is that what happened is she's testifying to all the many ways out of court that she is reenacting the alleged crimes that constitute the charges. And she's graphically going through each photograph, showing what she did, and specifically testifying over objection that she is – and the prosecutors are prompting her – that she's saying what our client – she's alleging what our client had done to her, which is clearly inadmissible. Prior consistent statements, the rule is clear that the ban on corroborative statements cannot come in when it's corroborated in court testimony, and so this reenactment should not have been admitted. And it was – Counsel, I'm going to ask you, and I don't mean to interrupt, but what you point out relative to the photographs and the reenactment, would that be technical error or is that reversible error in the context of a bench trial? It's reversible error because – for two reasons. One is the judge relied on it. Second one is it pervaded the trial. The third one, it came in and basically tarnished the character of our key witnesses on points that they – again, for no absolute reason other than to make them look bad. So – And do you have any case law to support that? Well, I've never seen this happen before. I mean, the case law that we rely on are the cases that say this is inadmissible. So what we do look at for reversible error is to see – is to see reliance and to see that the complaining witness is the main witness in the case, and when the trial judge disbelieves our witnesses that testify that she attempted to bribe the police department and don't believe her, then ergo it's somewhat of a simple analysis that it's reversible error. And it pervaded the trial. It – they were insinuating – and it was hearsay. It was also hearsay. It was coming in for the truth of who was talking, of who was calling the shots, of what was said out of court for the truth that, yes, indeed, she reenacted these crimes to the satisfaction of the state and violating that evidence rule. And then violating another evidence rule, Your Honors, that – which compounded this and insinuating that this participation was – was a bad act, which is, again, another way that you can impeach a witness, exploiting the – the photographs and – and the testimony by asking the detectives over objection, what part of sex did you not understand, which was obviously rhetorical, so it was bolstering her credibility and – and evoking sympathy for her at the same time, and then at the same time invoking hostility against police. All right, Counsel, can I switch gears for just a moment? Sure. Can we go to People v. Williams? Yes. And may I ask you, do you think that that's dispositive of your case and explain why you think so? It's dispositive of – of – of counts 8, 11, and 14. And – and actually it's dispositive of 25 – it's actually dispositive of all of – of – of all of the counts. So – Official misconduct or everything? Twenty-five – yeah, it is. It – it – but what it doesn't do is – is that – that he would be entitled to a new trial on – on the lesser – lesser offenses. So – so what we're asking your – your Honors is not – you do have to reach those issues because it does – it does determine what – what charges he can be retried on. So – so even though, yes, it is dispositive of the – of the greater crimes, we need either an outright reversal on – on the sufficiency of the evidence or new trials on the other issues. So you're arguing lack of sufficient evidence? Yes. Yes, that's correct. Turning to the second set of errors, which is the denial of the right to confrontation, the court refused to consider any of the complainant's activities – inconsistent statements on her activities that she was hustling for sex and money the same night as – in the same locations as the incident with our client. Why would that be material? Doesn't the Rape Shield Act preclude that? The Rape Shield Act does not include it – preclude it for – for two reasons. But the main one here is motive. And – and – and it cannot preclude motive in a case like this because it's relevant to show motive. And that's right out of the – the Sandoval case, which is the Supreme Court case on – on Rape Shield. And because when there's – the situation when – when a witness is motivated to falsify a charge, which a prostitute in this case would be doing, or someone who was prostituting, it's not so much that she is a prostitute, but that she was hustling that night. And it's – it's – shows motive in this case because it shows that she was hustling and looking for money in this case, which without this evidence, we don't know that except for the one fact that was disputed unfortunately by the complaining witness that Detective Besteda testified to, which is what – that she – she, meaning the complainant, attempted to bribe the police department. So it was relevant to – to – to show that she was – that she was conning him, that she was hustling him, and that she was doing it all along. And it was also relevant – and that's the – and then the other one is – is that it's her M.O., basically the complainant's M.O. It was the same night. It was the same location. It was the same gas station. And – and she was – and the theory being that we needed to substantiate and not just raise was that she was hustling him all along. It wasn't just at the police department. It was all along. And she had a motive to transform what was a consensual sexual act into a crime to make – to make money. And we were precluded from doing all of that. And – and – Let me ask you another question. Sure. On the issue of whether or not the defendant should be able to cross-examine her on whether or not she was prostituting at the time. In her testimony, she denied that. Correct. Right. If we found it relevant to the kidnapping, would there be an offer of proof that would have been offered as far as who would testify as to the – Yes, there was. And there – the offer of proof on – I think it was SR-142 was – was in the pretrial. There was a pretrial hearing. And trial counsel proffered that he had witnesses to testify as to who was under the porch and who was at the bus stop. And – and – and then the – and then also because – Well, that offer was made. Yes, the offer was made. And there was – I mean, it isn't just to the kidnapping. It's to all of it. And the – the offer was – there was – there was – there was to Assistant State's Attorney Brady was one statement that she was hustling at the gas station and meeting Marcus at 2 after which she encountered the – our client, which – the implication being that she was hustling at the time that she encountered our client. There was another statement to the lead detective that she went out at 1 o'clock trying to hustle at the gas station. There was one to Detective Besteda that she was out walking and trying to hustle, which is important, too, because there was no mention of time in there. And our theory is that she was hustling basically the whole night on and off all night. And then to Detective Bell, which is that she was – that she was hustling when she met our client when she went out to get cigarettes at 10 o'clock. And – So the testimony of those four would have been enough. Those four. And it's also important, though, too, Your Honor, is to read it. It's clear when it's read in conjunction with the pretrial because when you do that, you can see that – that – that counsel was trying to make a proffer, that there was hustling. It was hustling that was being excluded. It was hustling that he was trying to say that – that – that the complainant was saying. And also, the other point, too, on that was it is highly reliable evidence. She denies it, but some of it was under oath, and so her denials just accentuate the reason why we needed to perfect our impeachment on cross-examination. So we – we had a right to – to show that she was motivated by money to fabricate this – to use sex as a way of – of – of making more money and fabricating what was a consensual encounter. Wasn't it possible, though, to cross-examine the complaining witness without mentioning prostitution? No, because without – we needed – we needed it for several reasons. One is, is that for the issue of motive, if you – if you don't know what – well, there's two things actually. The first is, if you don't know what she's actually doing, then you don't have the financial motivation, and all those other comings and goings for innocuous or unconsidered reasons don't show any monetary or any – any hustling. They just don't, and – and all of those were excluded. The second thing is, we were – we were precluded from showing those comings and goings, because they were related to hustling, so the whole thing was kept out. We were not allowed to show that – that she left the house at 11.30 to – to get the last call for alcohol, or that she left to go on the bus stop, or that she was having sex with her drug dealer under the porch. And so we were not even allowed to do those things, but we needed the hustling, because the hustling is the only thing that would show the motive. And it was also necessary, too, to show that – what she was doing, so we could fit it into the timeline that was so crucial in this case, and – and to – we needed to do that because – because the complaining witness gave five or six times, and so without, you that – that her saying, oh, I don't remember, I don't know what I was doing, we were – we were not able to do that without the hustling. Can I ask you a question about kidnapping? Sure. Yes. Recent Supreme Court case, People v. Gonzalez. Yes, that's correct. It talks about the secret confinement. Yes. It just came down on January 31st, and we just saw it this morning. It doesn't And it's distinguishable, because basically there was an infant in that case, and the – the – one of the things that the Supreme Court said was that infant was not able to cry out, and therefore that there was the – the secrecy and the confinement was secret, whereas in our case we have an adult, and she was able to cry out. So even though we did cite it in the reply brief, we still have our other cases that talk about the definition and the – and the elements of secret confinement. Well, did they specifically hold that it's confined to the facts of that case? I don't believe it did. It's just that if it is distinguishable and – and it doesn't hurt our position. Turning to issue number five, which is the insufficiency of the evidence to sustain a conviction, we are mindful of the standard of review, but the deficiencies in this case were too numerous and too pervasive, and the complainant's assertion is too impossible. To name just a few, Your Honors, we have the complainant jumping into a caged police car, which turns out never existed, and escorting the police – escorting a police officer back to her apartment and into her bedroom under the pretense that she was going to give him an ID, when no one would think that a 40-year-old pedestrian who is not driving a car would be needing a driver's license and was under 40 and out after curfew, and even though she says she has cocaine lying openly on the dresser. We have a scene of the alleged offenses occurring with several generations of – of family members in the next room without a peep or an outcry, and the complainant – the complainant attempting to hide their names. We get the changing, if not clear, manipulation of the time factor five or six times that she was giving over a period of – of an eight-hour time span to put our client on duty for a lawsuit, and yet still was never – it could never have happened the way she said on – time-wise on any of the times that she was giving. Counsel, can I bother you?  I'm going to interrupt for another second relative to kidnapping. Sure. There are two different counts on the kidnapping, one relative to confinement and one is to inducement, correct? That's correct, but the one in this case was the secret confinement. Correct. So they merged, though, did they not? There – the – yes, that's correct, because there were – there was two charges. Actually, there was an aggravated and it was reduced to kidnapping and the other one merged. That's correct. Right. That's correct. So there's one remaining and that's the one with the four years. Yeah. So I think you argue that the kidnapping was inherent in the sexual assault? Yes, and also the elements weren't present. Right. Right, absolutely. But hasn't the Supreme Court articulated what is – what does it need to determine to – whether or not that arises to an independent crime? We didn't need to rely on that. I mean, that was – there was that Kokendall case. I don't think we even cited it. I mean, the inherent is really not necessary. I mean, I think I – it was probably buried in the analysis because it's based on the fact that the elements were not – were not met. I see. Okay. And then after – and this is part of the kidnapping that you're saying is that – that this – this – this encounter was – was bizarre. Well, bizarre isn't even the correct word other than it's impossible. It's actually a stronger characterization of what was happening here, that she would escort him back to the apartment and – and that she knew that you don't need an ID for a cigarette. So she would – certainly had – knew that – that she didn't have to go along with him. Shows again that it was consensual. And – and finally on this point, this is a case where there is no reason to disbelieve the detectives who testified. Not only that the complainant attempted to bribe the police department. The judge should have thought there was a lot of reason to disbelieve him. The judge made – those were the misstatements in the record. He made several misstatements. One, he said that – that – that Detective Basteda had not reported the bribe to the supervisor. And she did. In fact, she said – said – reported it to no one. And then – and she reported to her partner, a boss, a watch commander, a lieutenant, somebody named Bill Dunn. So she did a lot of reporting. So that was a misstatement. So that was one of the reasons he disbelieved her. Another reason was this reenactment of the crime that should never have come in to begin with. The – and – and – Well, but the trial court explicitly found – found the defendant's testimony to be incredible and unreliable. Well, two things were wrong with that. The first one was – What did you understand? He's made that – made that – I'm sorry. Go ahead. I'm sorry. What did he base that upon? Was – was your client impeached? No. Nothing. Was there a prior inconsistent statement? Absolutely not. Nothing. There was nothing. There was absolutely nothing. He – he – he went what he – he started out with a complaining witness and he said that – that – that he was holding her to the same standard that he was holding our client to, even though she was a drug addict at the time of the incident and at the time of trial. And our witnesses – our – our – our client and our witnesses, none of them were drug addicts. And – and he – and so he used that incorrect standard. And the other thing that he did wrong was is that after he had – I mean, it was an attempt almost of burden shifting that – that once he had found our witnesses unbelievable under the wrong standard, ergo he did not believe our client, when our client made no inconsistent statements and had – and – and – and she made all of these inconsistent statements. So it was – it – it was not – it – it was not a sound finding of fact. And that also the other reason he found our client guilty, which is – was – was that he – I mean, there were several pieces of evidence he misstated besides the – the reporting to the supervisor. But there was – he said there was – there was corroboration. Well, there was no corroboration other than the – the DNA, which wasn't even disputed, or the – the fact that she did go to the police. That's not necessarily corroboration when she's – this belated outcry. So – so that's a misstatement. And – and – and then he mistakenly found that she – that she had a working relationship with – with our client, and she didn't. So – so – and the – and then the most illogical one after that, which really should be enough to show that this finding cannot stand, is he held – he put a burden, an – an illogical burden on our witness detective Basteda to have arrested the complainant for bribery as a twisted reason for finding our client guilty. So this finding cannot stand. There was – it – it – it was illogical, and it was not supported by the – by the evidence. Counsel, can I ask you – you've claimed there are a number of inconsistencies in the victim's testimony. Were there any instances of perfected impeachment of that witness? Of the complaining witness? Yes, there were. And she made – she made many inconsistent statements on – well, it was less an inconsistent statement on – than – than that her – that it was bizarre, because the inconsistent statements were precluded. We were not allowed to impeach her on the – on the hustling. I mean, we were able to bring out that, you know, the saga of going to the liquor store and – and why was she doing that, and that she was hiding the condom and she was using that as a negotiating chip. But we – we were really precluded from doing that. So she did tell multiple stories. She did it on her own. She would say, I do rocks, I don't do rocks. She would say – What time did this incident occur? Pardon me? What time? It was on – Well, that's – we don't know. It was 5 – we don't know. Give me a span. It was an 8-hour – it was – it – it was between 10 and – and 7-15. And what is – what – this – this is all from the – who – where – where are these times coming from? The complaining witness who was – From her. Basically changing her times. From 7 p.m. till when? Till, well, 7-15 when she was the first time that she – no later than 7-15 when she walks into the – into the police station. And counsel asked for a bill of particulars and tried to pin – and it was not forthcoming. So basically we had this whole night of – of a moving target. And our position, of course, is that it did take place consensually between 10 and – at 10, as the state had testified to, before 11 as our client, which is – which dovetails. And that she spent 8 hours hustling and trying to figure out what she wanted to do. Now, I – I would – I believe Justice Connors asked you a question vis-à-vis People v. Williams and the charges in this case. And I don't know that you specifically answered that question. At least, I didn't hear the specific answer. How does that affect this case? Well, it reverses the 8 and 11 and 14 counts, which are the aggravated criminal sexual assault based on the misconduct charges, because – What misconduct? There's – there's five misconduct charges. There's – there's misconduct for – for failing to supervise members of a team, inattention to duty, failure to notify a superior authority than a sergeant. If you have someone of the opposite gender in your police car, failure to notify an authority if you go into a residence. Well, those are the acts. Those are the acts. That constitute a crime? Those are the – that constitute the misconduct. And the only one that – that didn't, that said – actually said criminal – said – that had a sex act in it, aggravated criminal sexual assault, he was acquitted on. So we have basically nothing left of the misconduct and nothing left of the aggravated criminal sexual assault. So it – it is dispositive of those things. But we – Count 29 is the official misconduct based on the criminal sexual assault? Right. And that's the only one that is not based on the instruction – on the instruction manual. If there are no further questions, we ask – Not right now. We may be back to you. Okay. Thank you. Thank you. We ask that the convictions be reversed or remanded for a new trial. You may now take your seats. Thank you. Good afternoon, Your Honor. My name is Bill Taffinetti. I'm an Assistant State's Attorney. If I seem a little befuddled at times, I had a very difficult time hearing the members – my opponent and the members of the court. I'm a little hard of hearing. So please bear with me. Me, too, Mr. Taffenetti.         I'm an Assistant State's Attorney. If I seem a little befuddled at times, I had a very difficult time hearing the members Let us know though, counsel, so we will speak louder than usual. All right, I won't. Go ahead, go ahead, go ahead. Okay. One thing I want to make clear from the outset as to the Defendant's first issue. The admissible of those photographs was never objected to. The relevance of those photographs was never objected to. Not prior to trial, not during the trial, not after the trial. They were not mentioned in the post-trial motion. They did come up in the argument on the post-trial motion, but only as it related to the sufficiency of the evidence overall. So the defendant never argued that they were not relevant. And in fact, they never really argued that they shouldn't be in evidence at all. And what this does is this means that we no longer are dealing with a reversible error question, we're dealing with a question of plain error. And it's the Defendant's obligation to demonstrate to this court that the evidence in this case is closely balanced, closely balanced to the point where we could have an innocent person being sent to prison for something he didn't do because of this error alone. I don't think we can say that any allegation of error rises to that level, first of all, and this goes to several issues that Defendant raised that have been forfeited. The evidence simply isn't closely balanced. Yes, we do have a very imperfect witness, but the judge found her testimony believable. And the judge is the arbiter of the credibility. And there is nothing in the record that one can point to which makes his determination of credibility of this witness improper as a matter of law or invalid as a matter of law. The judge also considered the testimony of the defendant and found it so unreasonable that it was perjurious. Counsel, let's talk about the photographs and the reenactment. All right. That was never objected to? They were not objected to. No, not the admission of the photographs, but that testimony on its own. That was never objected to by the defendant? There was some testimony that was objected to, yes. Usually, the fact, the first objection was not to the photograph, but that the photographs speak for themselves. Okay, so we're not talking about the relevance of the photographs, the admissibility of the photographs, but some of the testimony, some of the questions, particularly the form of the question, or there was one question as to whose idea was it to do the reenactment. And there was an objection, and our counsel, the state's attorney, withdrew the question, I think unnecessarily, because I think it was a proper question. But nonetheless, there were some objections that were ruled on by the court, one way or the other. Counsel, let me ask you, as far as its relevance and why was it offered? Okay, defendant makes a very basic error when she claims that they were offered to bolster the victim's testimony as to how the crime occurred. That was not the purpose for these photographs to come in. They were entered by the people to document how the investigation occurred. So as a result, they were contemporaneous photographs. They were taken to document what was happening at that time, not a reenactment of something that had happened before. But this is how the investigation unfolded. And the reason that this is relevant is because the investigation itself, as it was conducted by these two detectives, the integrity of this investigation is a matter, it's an issue. It's an issue. I'm sorry? Does that have any relevance to the innocence or guilt of the defendant? I think the worst that you could say is that the evidence came in prematurely. And if this was a jury trial, there would be a problem. Okay, but this is a bench trial, and the judge knows what's relevant. The judge knows what's not relevant. And it may not have been relevant immediately, but it became relevant when the defendant called these two detectives to testify on his behalf. And these detectives gave testimony which was specifically negated a lot of what the victim said. In particular, they testified that she went and bought alcohol without their knowledge, that she solicited a $5,000 bribe. And that it was her idea to reenact the assault for the benefit of her attorneys so they could document it for the inevitable civil suit. Let me just go back a question. What was her testimony relative to the bribe? I'm sorry? What was her, the victim's testimony relative to the bribe? To the bribe? Right. She's testified that as she was waiting in the interview room at the station, Detective Vestata came in and they chatted. And that Detective Vestata said that, that she offered her $5,000. No, Counsel, isn't it true that she made that affirmative statement, this would go away for $5,000? The victim? That's Detective Vestata's testimony, okay? Not our victim's testimony, that is Detective Vestata's testimony. And that is why the integrity of this investigation as to these two detectives is so important, because their testimony, Vestata's in particular, pointed to the defendant as soliciting a bribe in exchange for her not pressing these charges. And that goes diametrically opposed to the victim's testimony, in which the detective came in and said, in this approximate quote, you're going to be the first black woman whose pussy's worth $5,000 and went to high five her. No, Counsel, there's no question in the record. I mean, the way I read the record, I thought it was her testimony. After she saw the lineup, she was sitting in the room with Officer Vestata, and she's the one that said this would go away for $5,000. Whose testimony is that? I don't think that's true. I'm sorry, Your Honor, I think that's not true. I think that Ms. Olney's testimony was that the detective offered her $5,000. And that the detective testified that Ms. Olney told her that this would go away for $5,000. For the purposes of the sake of argument. I'm sorry? For the purposes of the sake of argument, just to answer my question. Would it have been different if she had been the one that- Well, if the record showed that the victim solicited a $5,000 bribe to make this go away, then, yeah, the case gets very uncomfortable. But, that's not what the evidence shows. Sorry to interrupt you, continue. Moving on to the second issue, the rape shield claim. All right, the rape shield doctrine bars the admission of any evidence of prior sexual conduct by the victim, except for defense. And that is what the defendant was able to get in. I mean, he was able to testify that they had a prior sexual relationship, and that was evidence of her consent. The second exception, the defendant is allowed to allege prior sexual activity when it is constitutionally required to be admitted. And this generally is when it needs to explain some physical evidence, such as semen pregnancy or physical indication of intercourse. Or, if it gives rise to a motive for her to falsely charge him. Now, what does this mean? The defendant cannot point to anything in the evidence that would give her a motive to sue him or to charge him, okay? He says that there is evidence that she is financially strapped, that she has a mercenary motive, and that her alleged prostitution is evidence, not just evidence of this, but it gives rise to the motive. Well, the prostitution is not something that gives rise to a motive to falsely arrest, it's the need for money that gives rise to a motive. And the defendant was able to cross-examine her, and she was very forthright about this, that she was a crack addict, that she needed a certain amount of rocks every, I think she smoked every other day. And that she needed a certain amount of dollars to do this. And they talked dollars and cents about how much money she needed. And she said that her income was based upon babysitting. Now- Counsel, can I ask you, when the state asked, on her testimony, she said she encountered the officer and he asked her, what are you doing out here? Are you prostituting or whatever? Is that what you recall from the testimony? The officer asked her, and she testified to that. I understand, did she not? She testified to what now? The officer asked her when they first encountered each other. Yes, when he first pulled up next to her, he asked her if she was prostituting. She said no. Right. And he asked, where's your identification? She said, back at the house. Correct. Does that open any door to any other testimony relative to that issue? No, I mean, the defendant can't open his own door. No, that was her testimony. How is the fact that she is, at least in her mind, rightly or wrongly going to say that the defendant in this case, the defendant, a Chicago police officer, committed these acts. And she's, in my view, that's standing alone. Isn't that opening up the possibility that maybe she might file a lawsuit? The judge knew about that. Well, I'm not fully aware of that, but how is that not a motive? The filing of the lawsuit is a motive. The lawsuit is a motive, no question about it. She needed money, here's a way to get it. Falsely accuse a police officer and sue the city for all sorts of big bucks. The judge heard about that. He knew there was a lawsuit. He knew about the depositions. And Detective Filippiak was able to testify that she told him that she had another source of income. He was not allowed to talk about what that source was. Defendant was able to cross-examine her and impeach her on who she was with, when she was with them, where she was with them. But not to the prior sexual activity. Because the prior sexual activity between her and any other person in this case does not impact upon the question of whether she had consensual sex with the defendant or whether or not it was forcible, forcible rape. Reasonable doubt. Defendant, and this court will notice that the standard of review is all the evidence must be looked at in the light most favorable to the people. Defendant would ask this court to look at all the evidence in the light most favorable to him and in the light least favorable to the people. That's the way her brief seems to be written. The issues of credibility and the issues of evidence all must be resolved in favor of the people. That's what light most favorable to the people means. All of those inconsistencies, all of the inferences must devolve in favor of the people. The question of credibility as who to believe and who not to believe, that's a ship that has sailed, that has left the harbor. The objective evidence supports her story. The timeline demonstrates that she called her pusher on her cell phone. The cell phone record shows at 525.27 seconds. And she stated that she called the pusher, she waited for him, she got the drugs, but decided not to smoke them until she went and got some beer and cigarettes. The defendant was out of touch with his department based upon his portable data terminal from 558.34 to 623.09. So that would indicate he met up with her about half an hour after she acquired her drugs, and then was out of touch with his department for about 24 and a half minutes. That's a perfectly legitimate and believable timeline that is consistent with her testimony. Isn't it interesting though, all the timeline she gave to every other investigating witness was between 3.30 and 4.30 for the most part? She stated in her testimony. Before trial, yeah. Yeah, I mean she did give different times, no question about it. But she stated in her testimony that she wasn't looking at a clock. And she also stated that she was smoking crack cocaine through the early morning hours, so her ability to tell time at this point is probably somewhat suspect. That's why it is important to look at the cell phone records. That is an objective indication. She stated that she encountered the police officer after the last call to the pusher, and the last call to the pusher came at 5.25 and 27 seconds. So the other testimony, or the other people she told, she just wasn't keeping track of time? Or when she said 3.30, the people at the hospital, or 4.30 at the hospital? Well, I mean she gave these people these times. It was the best estimate she could give at the time. It was closer to the time, though, was it not? I mean, it was right after it happened. Her testimony at trial occurred long after it happened. But that's contradicted by the cell phone record, okay? Her own testimony is contradicted. Her own testimony, not her testimony, not her testimony. Her own statements. The statements that she made to the original investigating officers, that's what it contradicts. At trial, she stated it was sometime after 5 o'clock, and- The cell phone records show that she made a call to her, one of her suppliers, a supplier, at such and such a time. Right. That's all it shows, right? That's all it relates to. And half an hour later, the defendant goes off the air for almost half an hour, for about 25 minutes, okay? That's what's important. It's the sequence and timing of these times. That's what corroborates her testimony. That's what makes it believable. Didn't her daughter say that at 5 o'clock the phone rang and she went into the bedroom? The daughter said that the phone rang and she went and answered it. It was in her mother's room. Her mother was not there. When asked what time, she said, like 5 o'clock. Okay, she didn't look at a clock. She doesn't know what time it is. She said, like 5 o'clock. And didn't she say she took the phone with her then, or she leave it in her mother's room? I think she took it back with her cuz she had to give it to her boyfriend. I think the call was for him. And they're sharing this phone. Yeah, yeah. So she says she took the call. We don't have an exact time as to when that came in. We have an estimate, which could be off by quite a bit. We don't know. I mean, because it is just an estimate. Counsel, can I ask you about the prior inconsistent statement? I'm sorry, what? The prior inconsistent statements that counsel talked about. They attempted to get in a substantive evidence from the civil deposition. Mm-hm. I'm confused about the court's ruling. There was a question about what was she doing at 4 o'clock? And that's a question that was asked her in the civil deposition. And she went on to answer, and I believe her answer was, yes, something happened at 4 o'clock. And she went in to describe the alleged rape or incident with the defendant. Now, they tried to get that in as substantive evidence. And the court's ruling, again, I'm gonna read it, and you tell me what it means. So for the limited purpose of her response to say someone, excuse me, I'll start again. So for the limited purpose of her response to someone saying, and so it would be improper to suggest that she had said it. She answered a question that someone else posed sometime around 4 o'clock, and then went on to answer questions about that event being stopped by Sergeant. I know what is going on. So for the limited purpose of establishing a chance of the question with the rendition about being stopped on the street, that the question being put to her about sometime around 4 o'clock would be around, that's the ruling the court made. Was that let in? Was it let in for a limited purpose? I cannot tell from the ruling in the court. Can you tell me what you think? No. I mean, it is what it is. Well, how do we know it's in or out of the testimony? Your response is refreshing, Mr. Taffanetti. I've been doing this a long time. So can you clarify that at all? I can't clarify what the judge meant by that. Let me say this. I think the judge was giving defense counsel benefit of the doubt. That is, if there's any relevance to that testimony, he would consider it for any purpose. I also think that in light of the fact that the defendant was not confronted with any of these statements during her cross-examination, not one, where the proper foundation was laid. She was not asked, did you ask these questions, did you give these answers? Defendant has to be, the victim has to be allowed to acknowledge the statement, deny the statement, admit a mistake, explain it. None of that happened. So there wasn't a proper foundation for any of these things. But the judge, I think, gave the defendant the benefit of the doubt. I also think that these statements have very little in the way of probative value for the substance. So even if a statement was kept out, it doesn't really hurt the defendant, because it doesn't make him any less or more guilty. It goes more to credibility than to substance. But the timing is important here, because once the records were disclosed relative to what he was doing on his police car or intercom or whatever, that could that have influenced her testimony? Could you run that one by me? When you look at the ongoing messages that the police officer was talking to his different people under his command or other people at headquarters, that time frame doesn't suggest that the rape could have occurred between 3.30 and 4.30, as she told all the other medical people. Isn't that right? Right. And could there have been any of that once maybe the defendant saw, well, my goodness, I've got to put it in somewhere else. Well, if given that the judge let it in, he gave it whatever probative value or impeachment value he thought was appropriate. All right. Again, at the risk of repeating myself, the judge is the arbiter of the credibility. He's the fact finder. And the court, this court has to be prepared to rule that he is wrong as a matter of law. Not that you would have ruled the other way, but that he is wrong as a matter of law that the evidence does not, taken even the light most able of people, does not prove the defendant guilty. And that bit of information, whatever the court looks to it, does not raise reasonable doubt. The official misconduct statute, which are the basis for the counts that this court asked for supplemental briefing on, was designed to reach those situations where a public officer or employee has in some way exploited his official position to the detriment of the public good. I think one thing that we can all agree on here is that this officer exploited his office, his official position to the detriment of the public good. The question is, the laws that he, the rules that he was accused of violating, are they laws for the purpose of the statute? The one thing that we have, first of all, in People v. Carmesita-Williams, the Supreme Court did not back away or did not abandon its previous holdings and the appellate court's previous holdings that rules and regulations can be a basis for an official misconduct prosecution. What it does say is that the rules have to be properly promulgated, that it has to be more than somebody writing out a set of rules and disseminating them to the department. And what we have in this case, which I submitted to the court in our supplement, we have two statutes, one of which, all of a sudden I can't find them, one of which gives the police board the power to write the rules and regulations. The second one, 2-84-220, general duties, this is the money quote. This is an ordinance of the city of Chicago. The members of the police force of the city, when on duty, shall devote their time and attention to the discharge of the duties of their stations according to the laws of the state and the ordinances of the city and the rules and regulations of the department to preserve order, peace and quiet and enforce the laws and ordinances throughout the city. And what this ordinance does is it confers upon the members of the department a legal obligation, a matter of law, that they must obey the rules and regulations of their department. This makes the rules and regulations properly promulgated. They have been subjected to and approved by the proper legislative body. That's the big flaw in Carmesita-Williams. What evidence was there at trial that there was any promulgation by an appropriate body? This is not a trial issue. Carmesita-Williams said that before you reach the issue of reasonable doubt, you have to solve the question, the court, the reviewing court, has to solve the question of whether or not the rule is a properly promulgated statute or law for the purpose of the statute. And they said this is a matter of interpretation of a statute and it is subject to de novo review. So this is not a jury question. This is a question for this court, all right? It could be dealt with in the trial court by virtue of a pre-trial motion dismissed for failure to state a cause of action. But the people do not have an obligation to prove to the fact finder the legislative process that resulted in this rule. Well, isn't that what Williams says? No, I don't think so. I think because Williams states that before you reach reasonable doubt, you have to answer this question. This is a law question. It's not a fact question. Once we, once, when we, um. Williams says the rules, therefore, were prescribed without any formal enactment or informal approval by a governing body. Isn't that the same situation here? There's no testimony relative to any enactment of these rules by a police board, by the city council, and you make an argument after the fact that they were incorporated by reference. Well, the quote that I'm relying on from that opinion is when assessing whether the evidence is sufficient to maintain a conviction, the reviewing court is like most faithful people. Before considering the sufficiency of the evidence, we must first determine whether the confidential rules are laws within the meaning of the official misconduct statute. That makes it a question of law for this court. I don't think we have to reinvent the wheel for the purpose of a jury or a fact finder. Because a jury of laypersons is singularly, you know, they're not well-suited to solve this question of what is and is not law. But what about a police witness saying, yes, these were promulgated by whatever and passed on whatever date and signed by the secretary? That's one way of doing it. I don't think it's absolutely. Isn't that what Williams says you need to do? No, I don't think Williams states that it has to be submitted to the fact finder. They may, I think it's reasonable to look at it and say the question is open. Because they said that even if the people's submissions were taken as true, they didn't amount to enough to show that it's properly promulgated.  And that means that this is a, the rules are, have been passed by the, they've been reviewed by the city council. And a legal obligation is conferred upon the members of the police department to follow them. Thank you. I've got a couple more questions. Is the aggravated sexual criminal assault premised, on count 29, the last count, on double enhancement? Yeah. The criminal sexual assault that's premised on the, excuse me, the official misconduct premised on, yes, that is a double enhancement. So we would have to demonstrate that one of the other convictions for criminal sexual assault, excuse me, for official misconduct is valid. Just one would be sufficient. But. So you're conceding that one falls? I'm sorry? So what's your concession there as far as 29? I'm sorry. I'm sorry. I thought you were making a concession at some point. No, no. I'm just agreeing that the criminal, the official misconduct that's premised, excuse me, we know what we're talking about. On 29, is double enhancement. Yeah. And it would merge with the others. Okay. Well, let me ask you this. What would be the effect on the other misconduct charges? If we find lack of sufficient evidence to support on the rules violations, would there be any impact on 29? I mean, if we say the rules, there wasn't enough testimony to support the foundation that's needed, one might claim in Williams. Does that affect count 29 or not? Which one's 29? 29 is the double enhancement. No. No, that would not affect that. Because that's premised upon a violation of a criminal statute, not the rules or regulations of the department. Okay. Now, let me ask you this. If we find double enhancement on the aggravated criminal, could we possibly convict on a lesser crime of official misconduct? Do you understand my question? Based upon. Do the, I'm trying to, there's so many counts. If the counts 8 to 11 and 14, they would be reduced to criminal sexual assault, right? Because they wouldn't be aggravated? Yeah. The official, the aggravated criminal sexual assaults are made aggravated by virtue of the fact that they were committed during the commission of the official misconduct. The official misconduct that are the basis of those are the rule violations of the department, not the aggravated criminal sexual assault statute itself. Correct. Okay. So, what we have here is that, let me back up a minute, give you a clear, present a clearer picture. We have a Chicago police officer, badge on his chest, gun on his hip in an official car, takes a woman off the street, essentially putting her under arrest, order her into his car, takes her to his house, her house, and assaults her repeatedly. He did this clearly in violation both of the rules of his department and of the criminal ordinance, criminal law statutes for sexual assault. If this isn't criminal sexual assault, if he's not on notice that, or official misconduct, then the statute kind of loses all meaning, all right? This is an officer who used his office to commit this offense. You know, this is not a woman being dragged off the street by some thug. This is a Chicago police sergeant who used his office to commit this offense, okay? And that's what is aggravating about this case. That's what raises this from class 1 to class X, that it was done by a police officer on duty committing the crime of official misconduct. Committing acts that he knew by law were forbidden by law, okay? Because when he took this woman into his car, he did so with the intent of the criminal sexual assault. When he took her up into her own apartment, he did so with the intent of criminal sexual assault. He failed to properly supervise his team because he was committing criminal sexual assault. You cannot separate these out. The indictment must be taken as a whole, and all of the counts must be read as a whole. And what you have here is a complete narrative of a Chicago police officer abusing his office in the worst way imaginable. And that's what makes this case so serious, and that's what makes these crimes, these counts of official misconduct so serious. We have proven our case beyond a reasonable doubt to the fact finder. There was no doubt in his mind. He made that clear. And there's no reason for this court, including under People v. Williams, to find any differently. So I would ask that these convictions and the sentences be affirmed. Thank you, Mr. Taffanetti. Counsel, rebuttal, give you 30 seconds. I'm joking, I'm joking. We're going to keep going until it starts snowing. That sounds good to me. You might be here until tomorrow. Thank you. The state and the court, the court asked in the state on the prior consistent statements and the hearsay and the smear campaign against our witnesses, asked how is this relevant? How is the investigation relevant? And said that it was relevant. Well, it's not relevant. Besides being hearsay and besides being a prior consistent statement. It's, it was not tied to relevant. And it's one thing to say that investigation is relevant when your, you meaning the opposing party, is accusing the other side of botching the investigation, of concealing evidence or missing a piece of evidence, like they did something wrong. But this was a horse of a different color. This was all about the complainant's feelings that she was hurt and humiliated and the state's attempt and efforts to prove that her feelings were justified because our detectives were compelling her to reenact the crime. That's not relevant. That investigation is not relevant. That is all about feelings and feelings are not an issue in this case. Counsel, what, was there any evidence in this case from anybody that these rules and regulations have been promulgated to any agency for the past time? There was less in this case than was done in Williams. In Williams there was on appeal the, this court asked to the state to supplement the record and they did. And the issue of judicial notice actually was not reached. And in this case there was nothing ever presented to the trial court and there's nothing ever presented here. But the municipal code that he cited, which is the identical problem that the Supreme Court faced with the Glenwood Police Department, to say that the municipal code, to say that it authorizes the police department to promulgate rules is not an enactment. In fact, the Williams court said, we do not think that the delegation to the police chief, which is his discretion to make rules for all kinds of things, trivial things, things about office gossip and rumor and what you do at the water cooler. And in Williams' case it wasn't trivial. It was very serious. It was drug peddling. So it was the same situation in this case. So to answer your question, no. There was no promulgation and there was no adoption and this case is no different than Williams. On the investigation on issue number one and the prior consistent statements in the hearsay and the smear campaign, there was no purpose to this. It was beyond the scope of anything the detectives testified to. All they testified to was for the limited purpose that there was a nail on the door to show the consent that no one would know about how to lock that door unless you had been there before, which has nothing to do with reenacting the crimes. Also for the limited purpose of denying the or of the telling the, excuse me, exposing the unauthorized purchase of a beer by the  so that was one of the purposes, and to divulge that the complaining witness had, yes, indeed, attempted to bribe the police department, which the trial judge found was a significant major piece of evidence. And if he had believed our witness, he would have found our client not guilty. On the issue of waiver on this issue, there were numerous objections to this testimony. The photographs in the testimony are inextricably bound. When the objections began, they were to the descriptive, the descriptions and the narrative that this complaining witness was saying what she did, and that is a prior consistent statement, and that is hearsay, and that is the exact same theory they were arguing on appeal. The hearsay is also included in that because when you're discussing description of what's in the photographs, you're certainly talking about hearsay, what was said and what was not said. As far as if this court were to reach an underplaying error, and we did argue alternatively underplaying error. We thought maybe there might have been a problem with the hearsay objection because the word hearsay was not used by counsel. We think it is clear that the court understood it. And the enactment was mentioned, of course, at the post-trial, and the judge did rely on the enactment. So that really should be the end of the inquiry, but we did also talk about the nature of the evidence. All we needed to show was that it was closely balanced. And the evidence is not, the evidence is overwhelming in the other direction. That there was all kinds of impeaching evidence against the complaining witness, and there's none in our case. There was no corroboration of her testimony other than DNA, and that's not even an issue that was disputed. So, and then we also argued plain error under the alternative subsection of 615, which is that it subverted the integrity of the process, bringing in these lawyers and the cameras and all of this, which is clearly a sidebar and clearly a sideshow. And it was inflammatory, and then the judge relied on it. So, it fits plain error under any of the categories, and there were numerous objections. On the prostitution, on the hustling, on the relevance to motive, the state argues that this is barred by rape shield, and that it doesn't bear on motive. Well, that is not correct. Number one, fabricating an offense, falsifying an offense is motive. And someone who extorts the police department and hustles for money is much more likely to be hustling than someone that isn't. Also, the state opened the door on the prostitution by saying, on direct examination, that our client, and this is the complainant's testimony, that he asked her if she was prostituting, and she told him no. So, we should have been allowed to impeach her. That she was prostituting, that she was hustling, and therefore was more likely to be hustling with him. And motivated to, as a disgruntled person who didn't get paid because our client testified that he did not pay her beyond cigarettes, and he testified that it was a sex buddy arrangement, which, your honors, is a euphemism for being a prostitute. And he felt bound by the judge's ruling that he could not say that she was prostituting that night because he wasn't allowed to say it. So, the exclusion of this evidence would have been, was crucial to the denial of our right to a fair trial to show what was happening, this was consensual, and that she was trying to extort the police department and extort him. Also, that when one, the state argues that the only issue here is the need for money and that was enough to show that she had a motive to extort. It is not just the need for money, it is the acting on the need for money. This isn't just someone that needed money as crack addicts do, and the judge heard that evidence, that's correct, he's right about that. But he didn't hear and he didn't entertain that she was going beyond just needing money, that she was willing and able to act on that. And that was what was excluded, and that denies a fair trial. On the timeline, this is going to the sufficiency of the evidence. First of all, the state applies, asks this court to apply the wrong standard of law on appeal. We realize that the standard is difficult or that it is deferential, but it is not as a matter of law. It is whether it is so unreasonable and improbable that a trier of fact or that this court can no longer be convinced beyond a reasonable doubt of his guilt. And to apply that at this moment when the state says, well, okay, we admit that she, or he's, in all due respect, trying to wiggle out of the times that she was giving, the 4 o'clock time which is in the deposition and that's when it occurred. It couldn't have happened at 527. Number one, that's not even the time that she was giving. She was not giving the 527 time. And when she gives the 527 time, as Your Honor was alluding to, it requires that there be a phone. And in the deposition, that phone was in the daughter's possession. So whoever made that phone call was the daughter and not her. So that whole testimony explodes. And then if you look at that timeline, it is impossible to have committed the time between 6 and 623 if you look at the 527. She needed to get her second or third or fourth stash of cocaine. She needed to start to smoke it. Then she noticed the missing booze and the cigarettes. This all takes time. Then she needs to encounter my client on the street and have three rapes in his apartment. Then she needs to cry like a bitch, unquote, for an hour or two. Then she has to salvage and preserve the condom and the towelettes. Then she has to contact and retain her attorneys because they could not possibly have just miraculously appeared with medical student and cameras. She had to have done all that and still rely at the station. It could not have happened at 527. It could not have happened after that. Either it would have been too early or it would have been too late. And there was no way that that could have happened at 527, which is a time that she didn't give. And finally, to answer Your Honor's question about what the meaning of that ruling was on the depositions, the judge erroneously believed that the complainant would need to be confronted with her testimony. And that is not the law. The law says that when it's under oath, there's no confrontation requirement. So that's what happened there. So he did not realize it was coming in for substantive evidence and not impeachment. And that's why I believe he made the muddled, confusing ruling that he made. And if there are not any further questions, as you're signaling me to round this up. No, I'm good. Michelle, any questions? No, I don't. Thank you, Your Honors. Thank you, Counsel. And that will be taken under advisement.